IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| LARRY D. WILSON JR., | § | |
| Institutional ID No. 02357491, | § | |
| Plaintiff, | § | |
| | § | No. 5:25-CV-021-BV |
| v. | § | |
| | § | |
| WARDEN WILLIAMS, *et al.*, | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Proceeding pro se and *in forma pauperis*, Plaintiff Larry D. Wilson Jr. filed this action under 42 U.S.C. § 1983, claiming violations of his constitutional rights while incarcerated at the Texas Department of Criminal Justice (TDCJ) Smith Unit. Dkt. No. 1. After careful review, the undersigned recommends that Wilson's claims be dismissed under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), and his claims for injunctive relief be denied as moot.

**1.     Wilson alleges that his civil rights were violated in the Smith Unit.**

Wilson's claims are based on events that occurred in July 2024 while he was incarcerated in the Smith Unit. Dkt. No. 1 at 8–13.[1] His version of events, fully accepted at this stage of the proceedings, are as follows:

Around 3:00 a.m. on July 13, 2024, other inmates attacked Wilson while he slept, causing injuries to his nose, face, eye, neck, and ribs. *Id.* at 8–10. The inmates also took

---

[1] Page citations to the complaint refer to the page number assigned by the Court's electronic filing system.

his property. *Id.* at 9. After the assault, a bloodied Wilson ran out of his cell and requested surrounding inmates to call for medical help. *Id.* About ten minutes later, Officer Morales arrived, but he laughed and instructed Wilson to return to his cell to clean up. *Id.*; Dkt. No. 11 at 2. Wilson requested medical care, but Morales refused and walked away. Dkt. No. 1 at 9.

A few minutes later, Lieutenant Lopez and other officers arrived and tried to handcuff Wilson, who refused. *Id.* Lopez and the other officers escorted Wilson to an administrative segregation dayroom to await the opening of the Smith Unit Medical Department. *Id.*; Dkt. No. 11 at 3. Around 5:00 a.m., Wilson called his father and sister to inform them of the incident. Dkt. No. 1 at 9.

An unidentified female sergeant escorted Wilson to the medical department when it opened around 5:30 a.m. *Id.*; Dkt. No. 11 at 3. An unidentified male nurse took Wilson to another room and "tried to stop the bleeding." Dkt. No. 1 at 10. The sergeant reported that Wilson had been attacked by other inmates, and Wilson noted his injuries. *Id.* While cleaning the injuries, the nurse called another staff member and explained Wilson's condition. *Id.* After that conversation, the nurse told the sergeant that Wilson should be sent to a hospital by van or ambulance. *Id.* The sergeant confirmed that officer would take Wilson to the hospital by van and then escorted him back to administrative segregation to await transport, even though his wounds were not adequately bandaged and were still bleeding. *Id.*; Dkt. No. 11 at 4.

Wilson again called his father between 7:00 and 8:00 a.m. because he was wondering if he would be transported to the hospital. Dkt. No. 1 at 10. Fifteen minutes

2

later, Captain Miller came to Wilson's cell and told him to stop calling his family because the wing was short-staffed, and officers would soon be taking Wilson to the hospital. *Id.* at 10–11. Wilson "did not believe Captain Miller because it had already been about five hours since the assault and robbery and [he was] still bleeding." *Id.* at 11 (cleaned up). Wilson called his father again, and Miller returned to warn Wilson against calling "because all the hospital [was] going to do [was] give [Wilson] some pain pills and put two rods in [his] nose to fix the problem." *Id.* Wilson asked for his "asthma pump" because he was "having breathing problems." *Id.* Miller refused to provide it. *Id.*

Around 10:45 a.m., Miller, Officer Ramirez, and two unnamed male officers transported Wilson to the hospital. *Id.* They reached the hospital in ten to fifteen minutes. *Id.* The officers ordered Wilson to walk inside while wearing restraints. *Id.* Three nurses asked what happened. *Id.* Wilson tried to explain, "but [Officer Ramirez and two other unidentified officers] started talking over [Wilson] and told [him] to be quiet." *Id.* The officers began telling the nurses a false story and would not allow Wilson to speak. *Id.* at 11–12; Dkt. No. 11 at 9–10. A nurse advised the officers that Wilson needed to answer the questions because he was the victim of the assault. Dkt. No. 1 at 12. Wilson informed the nurse that his ribs, neck, and face hurt. *Id.* The nurse then began cleaning Wilson's wounds and asked, "Where's this blood coming from?" *Id.* (cleaned up). Wilson responded, "I do not know." *Id.*

The nurse asked officers to remove Wilson's hand restraints so she could "continue her assessment of [Wilson's] injuries." *Id.* The officers responded that they needed approval, but they never removed the restraints. *Id.*; Dkt. No. 9–10. Wilson was

3

"then escorted to a room for X-rays," and records indicate that he was given a CT scan. Dkt. No. 1 at 12. He was also given an MRI scan. Dkt. No. 11 at 5. Wilson alleges that these scans were deficient because his hand restraints had not been removed. *Id.* at 5–6, 9–10. Wilson was escorted back to the examination room where he "waited for an hour or more for the results to come back." Dkt. No. 1 at 12. He received pain medication and was referred for a follow-up at the Smith Unit Medical Department. *Id.*

Officers returned Wilson to the Smith Unit and placed him in administrative segregation. *Id.* Wilson "still could not see out of [his] right eye," and he continued to feel pain in his ribs and face. *Id.* Wilson sought pain medication and his inhaler in the days following the hospital visit but did not receive them. *Id.* Specifically, when Wilson asked two unidentified female medical staff members for acetaminophen, they refused. *Id.* at 14; Dkt. No. 11 at 10. Wilson admits he received medication but not what he requested. Dkt. Nos. 1 at 14; 11 at 6. Wilson also submitted an I-60 request for a medical appointment with a female medical staff member who ignored him. Dkt. No. 11 at 10. Wilson did not receive follow-up care until he left the Smith Unit and arrived at the Robertson Unit. Dkt. No. 1 at 14.

Based on these events, Wilson filed suit, asserting claims against: (1) Warden Williams for failure to train staff and follow TDCJ policy requiring a lockdown while understaffed; (2) Officers Hernandes[2] and Morales for allowing the cell doors to be open, thus allowing the assault to occur; (3) Officer Morales for denial or delay of medical care

---

[2] Wilson spells Defendant Hernandes's surname inconsistently. The Court uses the spelling that Wilson uses the most in his pleadings, including his questionnaire responses. Dkt. Nos. 1, 11.

4

because he ignored Wilson's request for medical assistance; (4) Lieutenant Lopez for placing Wilson in administrative segregation rather than immediately calling for an ambulance; (5) an unidentified male nurse for failing to properly bandage and treat Wilson before he was taken to the hospital; (6) Captain Miller for waiting for staff to become available to transport Wilson to the hospital by van rather than calling for an ambulance; (7) Officer Ramirez and two other unidentified correctional officers for trying to prevent Wilson from speaking during his hospital examination and for not removing his restraints; (8) two unidentified female medical staff members and Captain Miller for delays in providing Wilson pain medication, his inhaler, and a medical appointment; and (9) the Smith Unit Medical Department for denial or delay of adequate medical care. Wilson seeks "monetary damages" and "punitive damages" and asks the Court to order Defendants to "protect [him] from unconstitutional conditions and treatment." *Id.* at 8.

The United States District Judge transferred this case to the undersigned United States Magistrate Judge for judicial screening under 28 U.S.C. §§ 1915 and 1915A. Dkt. Nos. 1, 6. The undersigned reviewed Wilson's complaint, authenticated records from TDCJ, and Wilson's responses to a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976). Dkt. Nos. 1, 9, 11. Because not all parties consented to a magistrate judge, the undersigned makes these findings, conclusions, and a recommendation in accordance with the order of transfer. Dkt. Nos. 6, 7, 8.

5

## 2.    The Court must dismiss claims that fail to meet certain pleading standards.

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). An action is frivolous if it lacks an arguable basis in either fact or law. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327. It lacks an arguable basis in fact if it rests on clearly fanciful or baseless factual contentions. *Id.* at 328; *see also Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992).

When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)). Courts should accept well-pleaded factual allegations as true and should not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). Although pro se pleadings are held

6

to less stringent standards than those prepared by lawyers, plaintiffs must still plead factual allegations "that raise the right to relief above the speculative level." *Id.*; *see also Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (reiterating that conclusory allegations will not suffice).

### 3.    Wilson's claims should be dismissed.

#### A. Sovereign immunity bars claims against the Smith Unit's medical department.

"The Eleventh Amendment bars suit against a state entity . . . regardless of whether money damages or injunctive relief is sought." *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 186 (5th Cir. 1986) (citing *Cory v. White*, 457 U.S. 85, 90–91 (1982)). The medical department—a department within the Smith Unit—is within the purview of TDCJ, which possesses sovereign immunity under the Eleventh Amendment. *Cox v. Texas*, 354 F. App'x 901, 903 (5th Cir. 2009) (per curiam) (explaining that certain "state law and § 1983 claims are barred unless . . . TDCJ has waved its immunity"); *see also, e.g.*, *Sowell v. TDCJ*, No. CV H-20-1492, 2020 WL 2113603, at *1 (S.D. Tex. May 4, 2020) (finding that a claim against the Estelle Unit Medical Department, a department of the TDCJ Estelle Unit, was barred by sovereign immunity). There is no indication that TDCJ has waived immunity. The undersigned thus recommends dismissal without prejudice of Wilson's claims against the Smith Unit Medical Department based on sovereign immunity.

7

## B. Official-capacity claims for money damages are barred by the Eleventh Amendment.

Wilson does not indicate whether he intends to sue the individual Defendants in their official or individual capacities. *See generally* Dkt. Nos. 1, 10. It is well-settled that the Eleventh Amendment bars claims for monetary damages against a state or state agency., *Aguilar v. Tex. Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998). It is also clear that a suit against a state officer in his or her official capacity is effectively a suit against that state official's office. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, an action for monetary damages against a state official in his or her official capacity is one against the state itself, which is barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Based on these cases, to the extent Wilson seeks to raise any official-capacity claim against a TDCJ official for monetary damages, it is barred by the Eleventh Amendment and should be dismissed.

## C. Wilson's claims for injunctive relief are moot.

Wilson also asks the Court to "make [Defendants] protect [him] from unconstitutional conditions and treatment." Dkt. No. 1 at 8. This is a request for injunctive relief. "[T]o establish eligibility for an injunction, the inmate must demonstrate the continuance of [a] disregard [of an objectively intolerable risk of harm] during the remainder of the litigation and into the future." *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). Transfer of a prisoner out of an institution will often render the prisoner's claims for injunctive relief moot. *See, e.g., Cooper v. Sheriff, Lubbock Cnty.*, 929 F.2d 1078, 1084 (5th Cir. 1991) (per curiam) (holding that prisoner's transfer to

8

another prison rendered moot his claims for injunctive relief); *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) ("The transfer of a prisoner out of an [offending] institution often will render his claims for injunctive relief moot."); *Blackmon v. Kukua*, 758 F. Supp. 2d 398, 406, 414 (S.D. Tex. 2010) (dismissing prisoner's claims for injunctive relief as moot when he was transferred to a different TDCJ unit and he gave "no indication that he [would] be transferred back to [the original facility where the alleged constitutional violation occurred] and once again be exposed to [the alleged unconstitutional conditions of confinement]").

Wilson's suit relates to events that occurred in the Smith Unit in July 2024. Wilson affirms that he was transferred to the Robertson Unit in August 2024 and received care there. *See* Dkt. Nos. 11 at 1 (providing that he was housed in the Smith Unit from December 2023 to August 2024), 8–9 (stating that at his follow-up visit at the Robertson Unit on August 19, 2024, he advised medical staff of his issues and received medication for PTSD); *see also* Dkt. No. 12 (change of address reflecting that Wilson was transferred to the TDCJ Hughes Unit). Wilson alleges no facts indicating that he may return to the Smith Unit or that any repeated or ongoing violation will occur. Thus, Wilson's claims for injunctive relief should be dismissed as moot.

### D. Wilson fails to state a claim against Warden Williams for failure to train staff and failure to follow TDCJ policy regarding lockdown and staffing.

Wilson claims that Warden Williams failed to adequately train Officers Hernandes and Morales. Wilson also alleges that Warden Williams failed to follow TDCJ policy requiring that the unit be locked down due to understaffing.

9

## **Failure to train**

Wilson alleges that Warden Williams failed to adequately train Officers Hernandes and Morales, as evidenced by their leaving cell doors open, which Wilson claims led to the assault. Dkt. Nos. 1 at 5; 11 at 10–11. But Wilson does not allege any pattern of similar violations, and he fails to offer facts showing that Williams was responsible for training, so this claim should be dismissed.

Supervisory officials cannot be held liable under § 1983 for their subordinates' actions on a theory of vicarious or *respondeat superior* liability. *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Instead, a plaintiff must show that a supervisor (1) affirmatively participated in an act that caused a constitutional deprivation or (2) implemented an unconstitutional policy that caused injury to the plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)).

Failing to train subordinates may support a policy claim. A supervisor may be held liable under § 1983 for failing to train or supervise subordinates if a plaintiff can prove that (1) the official failed to train or supervise the correctional officers, (2) a causal link exists between the failure to train or supervise and the alleged violation of the inmate's rights, and (3) the failure to train or supervise amounted to deliberate indifference. *Walker v. Upshaw*, 515 F. App'x 334, 339 (5th Cir. 2013) (per curiam) (citation omitted). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a [prison official] disregarded a known or obvious consequence of his action." *Id.* (alteration in original) (citation omitted). If an official's actions "are merely inept,

10

erroneous, ineffective, or negligent," then they "do not amount to deliberate indifference and do not divest officials of qualified immunity." *Id.* at 339–40 (citation omitted).

"Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Id.* at 340 (citation omitted). "The plaintiff must generally demonstrate at least a pattern of similar violations . . . [and] the inadequacy of training must be obvious and obviously likely to result in a constitutional violation." *Id.* (alterations in original) (citation omitted).

In narrow circumstances, however, a single incident may be sufficient for liability if a plaintiff "prove[s] that the 'highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train represents the 'moving force' behind the constitutional violation." *Est. of Davis*, 406 F.3d at 386 (citation omitted). But the Fifth Circuit has emphasized that the single-incident exception is rare because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Walker*, 515 F. App'x at 340–41 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Moreover, "mere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability." *Id.* at 340 (citation omitted).

Wilson fails to provide sufficient facts to support his failure-to-train claim. He asserts that "Warden Williams is responsible for all TDCJ staff on his unit," and that Williams "train[s] them [based on] how [Williams] want[s his] unit r[u]n." Dkt. No. 11

11

at 10. But Wilson provides no information about the training the officers receive and instead asserts that Williams "allow[ed] officers at night to roll doors from the picket without a[n] officer on the floor." *Id.* at 11. Thus, Wilson seem to simply attribute liability to Williams based on his role as the warden and not based on any facts related to Williams's involvement in developing policies or training subordinates. This is insufficient to state a failure to train claim. *See Speck v. Wiginton*, 606 F. App'x 733, 736 (5th Cir. 2015) (per curiam) (providing that inferring "a single alleged incident of misconduct means officers are inadequately trained . . . is at odds with the law against *respondeat superior* liability in section 1983 cases").

Wilson also makes no attempt to show a pattern of similar violations, nor has he shown that any training that Officers Hernandes and Morales received was deficient in that it was "obviously likely to result in a constitutional violation." *Walker*, 515 F. App'x at 340. Further, Wilson has not explained how the alleged lack of training led to a "highly predictable" consequence that he would be assaulted, and thus he fails to show that the single-incident exception should apply. *See id.* (reversing where "[p]laintiffs ma[d]e no attempt to show a pattern of [defendant's] employees failing to protect inmates" and failed to show that the rare single-incident exception applied). Because Wilson fails to offer any support for his conclusory allegations, he has not stated a failure-to-train claim. *See, e.g., Mendoza v. Davis*, No. 5:17-CV-291-BQ, 2018 WL 11251905, at *3 (N.D. Tex. May 10, 2018) (finding that prisoner "ha[d] not pleaded sufficient facts to raise a viable failure to train claim against [official]" because the prisoner's "allegations focus[ed] on the harm caused to him from a single incident" and

12

"he ha[d] not alleged a pattern of harm caused by officer misconduct").

Because Wilson has not alleged facts sufficient to state a failure-to-train claim against Williams, the undersigned recommends dismissal of this claim.

### Understaffing

Wilson alleges that Williams failed to follow a TDCJ policy requiring a "lockdown" of the unit due to understaffing. Dkt. Nos. 1 at 5; 11 at 11. But Fifth Circuit "case law is clear . . . that a prison official's failure to follow the prison's own policies, procedures or regulations does not," standing alone, amount to a constitutional violation. *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (per curiam); *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 753 (5th Cir. 2023) (explaining that "a failure to follow prison policies, procedures, or regulations—without more—does not give rise to a constitutional violation" (citation omitted)); *see also Armour v. Davis*, No. 6:18CV535, 2020 WL 2850140, at *17 (E.D. Tex. June 1, 2020) (observing "that there are fewer guards on the wing than [plaintiff] believes appropriate is not itself a constitutional violation"). Thus, Wilson cannot state a claim against Williams for the purported failure to follow a TDCJ staffing policy without alleging more.

To the extent that Wilson alleges that Williams is responsible for an unconstitutional practice of understaffing, such a claim still fails because "understaffing, without more, is not proof of official policy." *Armour*, 2020 WL 2850140, at *17 (citations omitted); *cf. Gagne v. City of Galveston*, 671 F. Supp. 1130, 1135 (S.D. Tex. 1987) (finding that pretrial detainees' "general and conclusory allegations of inadequate

funding and inadequate staffing support a section 1983 action against the City"), *aff'd*, 851 F.2d 359 (5th Cir. 1988).

Wilson has not alleged any facts suggesting that Williams was aware of and consciously disregarded a substantial risk of harm based on understaffing. Thus, Wilson's claim fails. *See Hinojosa v. Johnson*, 277 F. App'x 370, 379 (5th Cir. 2008) (per curiam) (finding that the district court correctly denied discovery and granted summary judgment for defendants on prisoner's understaffing claim because prisoner failed to provide any evidence that the supervisory defendants affirmatively participated in any unconstitutional acts or implemented a policy of understaffing; were aware that the understaffing produced a substantial risk of harm; or could have and failed to take reasonable steps to rectify the issue); *Kopatz v. Doe*, No. 5:22CV156-RWS-JBB, 2024 WL 2106572, at *6 (E.D. Tex. Feb. 5, 2024) (finding that plaintiff failed to state a claim against TDCJ official when he "failed to show that [supervisor] affirmatively implemented a policy of understaffing or . . . failed to take reasonable steps to alleviate the problem"), *R. & R. adopted by* 2024 WL 1597748 (E.D. Tex. Apr. 12, 2024); *Armour*, 2020 WL 2850140, at *17 ("[Plaintiff] has offered nothing to suggest that the [d]efendants could have but intentionally did not adequately fund and staff the prison.").

In sum, Wilson has not alleged any facts showing that Williams is liable for failing to train Hernandes and Morales based on the single incident of assault. Wilson has also not provided any facts showing that Williams implemented a policy of understaffing or that he was aware of and disregarded a substantial risk of harm due to understaffing. The

14

undersigned thus recommends that the district judge dismiss Wilson's claims against Warden Williams.

### E. Wilson has failed to allege sufficient facts to show that Officers Hernandes and Morales were deliberately indifferent to Wilson's need for protection.

Wilson alleges that Officers Hernandes and Morales allowed the cell doors in his area to be open, which permitted inmates to assault him. Dkt. No. 1 at 5. The Court understands Wilson to be asserting a failure-to-protect claim. This claim fails because Wilson has not alleged facts showing that there was a substantial risk of harm and that the officers knew of and disregarded such a risk.

Under the Eighth Amendment, "prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006) (citing *Farmer*, 511 U.S. at 832–33). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. An Eighth Amendment failure-to-protect claim consists of both objective and subjective components. *Id.* at 839. To satisfy the objective component, a plaintiff must show that he was exposed to a substantial risk of serious harm. *Id.* at 834. On the subjective component, a plaintiff must establish that the defendants were deliberately indifferent because they were aware of an excessive risk to the plaintiff's safety yet consciously disregarded that risk. *Id.* at 840–41. Importantly, "[m]ere negligence or a failure to act reasonably is not enough." *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003).

15

Wilson has not alleged facts demonstrating that there was a substantial risk of serious harm before the assault—that is, he has not shown that he was vulnerable or susceptible to risk of assault by the attacking inmates such that leaving the cell doors open was unreasonably dangerous. *See Mosley v. Anderson*, 503 F. App'x 272, 274 (5th Cir. 2012) (per curiam) ("[Plaintiff inmate] has not alleged any particular establishing that the defendants knew that [attacking inmate] presented a risk of serious harm [to plaintiff] and purposefully exposed [plaintiff] to that risk."). In addition, Wilson has not pleaded facts suggesting that Hernandes or Morales were *aware* of a substantial risk of serious harm. *See, e.g., Dixon v. Valdez*, No. 3:11-CV-1139-D-BK, 2011 WL 4398305, at *2 (N.D. Tex. Aug. 4, 2011) (recommending dismissal of plaintiff's failure to protect claim because his "pleadings fail[ed] to allege that [d]efendant and her staff were aware of any risk to [p]laintiff's safety prior to the . . . assault, or that they inferred any risk to [p]laintiff's safety"), *R. & R. adopted by* 2011 WL 4398280 (N.D. Tex. Sep. 21, 2011); *Zweifel v. Jefferson Par. Corr. Ctr.*, No. 09-2997, 2009 WL 1459696, at *7 (E.D. La. May 26, 2009) (dismissing prisoner's failure to protect claim against female guard who briefly left her post because "even accept[ing plaintiff's testimony and allegations] as true in [their] entirety," plaintiff stated a negligence claim at best, which is not cognizable under § 1983).

In sum, Wilson's claim fails to satisfy either the subjective or objective component. Even accepting Wilson's allegations as true, he has at most asserted a negligence claim against Hernandes and Morales, which is insufficient to show that they

were deliberately indifferent. *Hare v. City of Corinth*, 74 F.3d 633, 641–42, 646 (5th Cir. 1996) (en banc); *Mace*, 333 F.3d at 626. The claims against them should be dismissed.

### F. Wilson has failed to allege sufficient facts to state a claim for deliberate indifference related to medical needs.

Wilson claims that several officials were deliberately indifferent to his medical needs. He alleges that some officials—Officer Morales, Lieutenant Lopez, the unidentified male nurse in the Smith Unit Medical Department, and Captain Miller—were deliberately indifferent to his medical needs before he was taken to a hospital. Wilson claims that other officials—Officer Ramirez and two unidentified officers—delayed or denied medical care by trying to prevent Wilson from speaking during his hospital visit and by failing to remove his hand restraints. Finally, Wilson asserts that after he returned to the Smith Unit, two unidentified female medical staff members and Captain Miller failed to provide pain medication and an inhaler. One of the female staff members also denied Wilson's request to be seen.

To establish an Eighth Amendment violation, a prisoner must show that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Deliberate indifference requires a showing that the prisoner was exposed to a substantial risk of serious harm, and the official knew of and consciously disregarded that risk. *Farmer*, 511 U.S. at 839–41; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (per curiam) (stating that a prison official is not liable for the denial of medical treatment unless he knows of and disregards an excessive risk to an inmate's health or safety).

17

Deliberate indifference is "an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).

An official's "failure to alleviate a significant risk that [he or she] should have perceived, but did not[,] is insufficient to show deliberate indifference." *Id.* (internal quotation marks omitted). Likewise, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks and citation omitted); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and the inmate must show that the prison official was actually aware of the risk of harm and consciously ignored it). Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). And a prisoner's disagreement with a medical provider's course of treatment does not give rise to a constitutional claim. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

A claim based on a delay in the provision of medical care also arises under the Eighth Amendment. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). Deliberate indifference can be "manifested . . . by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). In addition to showing deliberate

indifference related to the delay in care, an inmate must show that the delay resulted in substantial harm. *Batyukova v. Doege*, 994 F.3d 717, 732 (5th Cir. 2021). Additional pain suffered during the delay that could have been otherwise alleviated can constitute substantial harm. *Id.* at 732, 733. An increased risk of bodily harm or death can also constitute substantial harm. *Id.* at 733.

### Wilson's initial request for medical assistance

Wilson alleges that Officer Morales was deliberately indifferent to Wilson's need for medical care because when Wilson first requested assistance, Morales only laughed and told Wilson to return to his cell while Morales closed the cell doors. Dkt. Nos. 1 at 9; 11 at 2. While Morales's conduct "w[as] clearly insensitive, being callous or rude in the context of medical care does not an Eighth Amendment violation make." *Beard v. Gusman*, No. 13-6633, 2015 WL 422999, at *3 (E.D. La. Feb. 2, 2015) (citation omitted). Wilson admits that moments after his interaction with Morales, "many officers . . . came into the wing" to take Wilson to administrative segregation to wait for the Smith Unit Medical Department to open. Dkt. No. 1 at 9. Wilson also states that, once the medical department opened at 5:30 a.m., officials promptly had him seen. Dkt. No. 11 at 3. Thus, Wilson does not allege sufficient facts showing that, by ignoring Wilson's request for assistance for a few minutes, Morales caused a delay in medical treatment. Wilson also fails to allege any substantial harm that resulted from the temporary delay. Thus, Wilson fails to state a claim for delay in care against Morales.

19

### Delay while waiting for the medical department to open

Wilson claims that Lieutenant Lopez delayed medical care because, rather than immediately calling an ambulance, she required Wilson to wait in administrative segregation until the Smith Unit Medical Department opened at 5:30 a.m. Dkt. Nos. 1 at 6, 9; 11 at 3.

While Wilson states that he had visible injuries and that he reported his symptoms to Lopez, Wilson has alleged no facts his injuries constituted an emergency or required care beyond what the Smith Unit Medical Department could provide once it opened within an hour or two, much less that Lopez discerned as much. *See* Dkt. Nos. 1 at 9; 11 at 3. Indeed, despite Wilson's visible wounds, he also reports he was able to walk to and from the administrative segregation and medical units, converse with officials, and make phone calls to his family members while waiting. *See* Dkt. No. 1 at 9–10. Wilson alleges no facts showing that there was a substantial risk of harm associated with waiting to see a provider in the medical unit rather than pursuing offsite care or that Lopez knew of, and ignored, that risk. *See, e.g., Rogers*, 709 F.3d at 410 (affirming dismissal of a prisoner's claim that officials were deliberately indifferent to his medical condition when they transported him to the prison medical department instead of taking him to the emergency room for immediate evaluation); *Chesnut v. Horton*, No. 2:08-CV-0023, 2009 WL 1269992, at *4 (N.D. Tex. May 7, 2009) (rejecting the plaintiff's claim that a defendant was deliberately indifferent by not arranging for emergency medical care because there were no facts alleged to show that the defendant knew the emergency medical care was

20

needed or that the plaintiff suffered any substantial harm as a result of waiting until the unit infirmary opened the next morning).

Moreover, Wilson's allegations show that Lopez was not deliberately indifferent. Wilson admits he was segregated from other prisoners and that he waited for no more than two hours before being taken to the medical unit when it opened, establishing that his complaints were not ignored. Dkt. No. 11 at 3. While Wilson implies that Lopez should have known that Wilson required more care because the medical unit staff subsequently reached a decision to send him to the hospital, Wilson provides no facts showing that Lopez, as a non-medical official, should have known that a walking, talking, lucid Wilson needed immediate hospital care. Dkt. No. 11 at 3. And the relatively brief delay between Wilson's placement in administrative segregation and his arrival at the medical unit is not indicative of deliberate indifference. *See, e.g., Williams v. Collier*, No. 6:22CV359, 2024 WL 1152592, at *10 (E.D. Tex. Feb. 9, 2024) (observing that "[w]hile the record confirms some delays between [p]laintiff's complaints and the care provided, brief delays in the provision of care alone do not amount to deliberate indifference."), *R. & R. adopted by* 2024 WL 1149298 (E.D. Tex. Mar. 14, 2024); *White v. Rader*, No. 09-0696-JJB-CN, 2010 WL 1744652, at *4 (M.D. La. Mar. 29, 2010) (dismissing prisoner's deliberate-indifference claim based on delay in care because he "concede[d] that he was seen by medical personnel within approximately eight hours after reporting his fall, and this relatively brief delay is not indicative of deliberate indifference" (citing cases in support)), *R. & R. adopted by* 2010 WL 1737139 (M.D. La. Apr. 28, 2010).

Because Wilson has not alleged facts demonstrating that Lopez was subjectively aware of a substantial risk of harm, his deliberate-indifference claim against Lopez fails.

**Insufficient treatment of injuries**

Wilson alleges that the unidentified male nurse who saw Wilson at the Smith Unit Medical Department was deliberately indifferent to his medical needs. Dkt. Nos. 1 at 10; 11 at 4. Because Wilson concedes that the nurse provided treatment and only disagrees with the type of treatment provided, Wilson has failed to state a claim.

Wilson avers that the nurse "tried to clean blood off [Wilson's] face" and stop the bleeding, but he did not give Wilson pain medication and "did not bandage [Wilson] up." Dkt. Nos. 1 at 10; 11 at 4. Wilson also states that the nurse called another medical staff member to consult regarding Wilson's injuries. Dkt. No. 1 at 10. Then, the nurse "told th[e] unknown female sergeant that [Wilson] either be sent to the hospital by van or call an ambulance." *Id.* (cleaned up). Wilson's concession that the nurse contacted medical staff and relayed the recommendation that Wilson be transferred to a hospital undermines Wilson's claim that the nurse was deliberately indifferent. *See Williams v. Certain Individual Emps. of Tex. Dep't of Crim. Just.-Institutional Div. at Jester III Unit*, 480 F. App'x 251, 257 (5th Cir. 2010) (explaining that the fact prison official's efforts to facilitate treatment were unsuccessful did not mean that he was deliberately indifferent). Moreover, Wilson acknowledges the nurse attempted to stop his bleeding and clean his face, and although Wilson feels more should have been done, his disagreement with the care he received is insufficient to show deliberate indifference. *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018); *Norton*, 122 F.3d at 292. Even if the care provided proved

inadequate—and Wilson has not made that showing—he has at most stated a claim for negligence, which does not establish a constitutional violation. This claim against the nurse should be dismissed.

### Delay between medical department visit and transportation to the hospital

Wilson alleges that Captain Miller was deliberately indifferent "by refusing to call for an ambulance knowing that" there were "no officers to transport [Wilson] to the hospital to receive emergency medical treatment." Dkt. No. 1 at 6. As discussed below, Wilson does not show that emergency treatment was recommended or that Captain Miller should have independently discerned that there was an emergency. And, as previously discussed, a mere delay in receiving medical care is not, by itself, a constitutional violation. *See Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (per curiam); *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Rather, "[d]elays in medical treatment are unconstitutional only if they result from a prison official's deliberate indifference and cause 'substantial harm.'" *Magee v. Rivera*, No. 2:24-CV-00309, 2025 WL 1920524, at *8 (S.D. Tex. May 29, 2025) (citation omitted), *R. & R. adopted by* 2025 WL 1918851 (S.D. Tex. July 11, 2025). Based on the facts alleged, Wilson has not sufficiently stated a claim for deliberate indifference against Miller.

First, regarding deliberate indifference, Wilson has not sufficiently alleged that a substantial risk of serious harm existed. Wilson alleges that medical staff determined that he needed to "be sent to the hospital by van or . . . an ambulance." Dkt. No. 1 at 10. But Wilson alleges no facts demonstrating that the medical staff communicated to Miller that Wilson's condition presented an emergency or risk of serious harm. *See id.* Wilson

23

states he was in pain, but he does not indicate that the medical staff informed Miller that no pain medication was administered or that Wilson would be subject to severe pain pending transport. *Id.* at 11–12.

"There is ample case law in [the Fifth Circuit] indicating that denying or unreasonably delaying medical treatment to someone in need of immediate medical assistance constitutes deliberate indifference." *Ford v. Anderson Cnty.*, 102 F.4th 292, 312 (5th Cir. 2024). For example, where a nurse learned of critical blood test results and failed to act in response to those results for over six hours, there was at least a question of fact as to whether the nurse acted with deliberate indifference. *Id.* at 312–13. Here, however, Wilson does not allege that Miller knew anything more than that Wilson needed to be seen at the hospital for care the onsite clinic could not provide and that the onsite medical staff said Wilson's transport could take place by van or ambulance. Wilson makes no allegation regarding there being any specified timeline. Without more, Wilson's claim of a substantial risk of harm falls short.

Furthermore, even if Wilson objectively established a substantial risk of harm, he fails to allege facts demonstrating that Miller was subjectively aware of that risk. Wilson states that Miller knew that Wilson needed to be seen at the hospital and could be transported by prison van. *Id.* at 10. Wilson does not allege that Miller knew or should have known that Wilson's condition constituted an emergency or that Miller was made aware of facts showing that Wilson would suffer serious harm if he were not transported immediately.

24

Moreover, Miller's conduct does not evince "wanton disregard" for Wilson's medical needs. According to Wilson, after the medical department visit, Miller returned to administrative segregation twice and advised that he was waiting for staff to become available to transport Wilson to the hospital. *See id.* at 10–11. Miller's efforts to find staff to transport Wilson, along with his checking on Wilson twice, show that he was not ignoring Wilson's medical needs. In other words, Wilson's allegations show Miller was not refusing, interfering with, or disregarding the recommendation to send Wilson to the hospital; Miller was simply trying to arrange van transport—which the medical staff indicated would be sufficient—by securing appropriate staff, which apparently led to some delay. *See id.* That delay was a matter of hours, such that Wilson was taken to the hospital around 10:45 a.m. on the same morning that the prison medical department recommended that he be seen at the hospital. *Id.* While that delay may be longer than Wilson—or the Court for that matter—would have preferred, Wilson alleges no facts showing that delay was the result of Miller's wanton disregard for Wilson's serious medical needs.

Finally, Wilson fails to show that substantial harm actually resulted from Miller's conduct. *See Batyukova*, 994 F.3d at 733; *Mendoza*, 989 F.2d at 195. Wilson claims that the delay in transport caused him to suffer "mental trauma," "[his] nose [is] still not fixed," and his "vision still goes blurry in [his] right eye at times." Dkt. No. 11 at 5. But Wilson alleges no facts to show that these injuries were attributable to the delay in care rather than the assault itself. *See, e.g., Drake v. MS Dep't of Corr.*, No. 4:24-CV-00041-DAS, 2024 WL 2852211, at *3 (N.D. Miss. June 5, 2024) ("Moreover, [plaintiff's]

allegations fail to set forth a substantial harm *resulting from the delay in care* provided nor do they indicate that *the delay exacerbated or worsened the alleged injury.*" (emphasis added)). Wilson also states that when he arrived at the hospital, he was in "serious pain." Dkt. No. 1 at 11; *see also* Dkt. No. 11 at 3 (stating that during the alleged delay, his ribs, head, and neck "hurt," and he couldn't see out of his right eye). "[S]evere pain caused by the refusal to immediately treat pain can support a claim of deliberate indifference grounded in delayed treatment." *Williams*, 480 F. App'x at 257; *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017) (per curiam) (same). But Wilson's own account of being able to walk, talk, stand, sit, and make phone calls to his family suggests that his pain may not have been of the type and quality of that needed to constitute "substantial harm." *See* Dkt. No. 1 at 9–11. And even if it were, he does not show that Miller was aware that Wilson had not received adequate pain management from the prison medical staff.

Wilson also asked Captain Miller to get Wilson's asthma pump due to difficulties breathing. *Id.* at 11. However, Wilson has alleged no facts demonstrating that his medical need for the asthma pump was sufficiently serious such that Miller was deliberately indifferent. *See id.*; *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 527 (5th Cir. 1999) (affirming summary judgment for officers because "[n]one of the[] alleged facts indicate[d] [an asthmatic woman's] medical needs were serious while [the officers] were responsible for her," even though she informed the officers that she had asthma, requested her inhaler, and "was experiencing shortness of breath"); *Murray v. Miller*, No. 5:23-CV-188-BV, 2024 WL 6901585, at *11 (N.D. Tex. Oct. 2, 2024)

("While [plaintiff] claims that he requested that [defendants] provide him with his inhaler because he could not breathe, [plaintiff] has not demonstrated that they appreciated that [plaintiff] was suffering from an emergent medical issue that they then ignored."), *R. & R. adopted by* 2025 WL 2990232 (N.D. Tex. Oct. 24, 2025). Accordingly, Wilson has not stated a claim of deliberate indifference against Miller based on the denial to provide the asthma pump.

In sum, although there was some delay between the recommendation from the medical staff that Wilson be seen at the hospital and his actual transport to the hospital, Wilson has not shown that Miller was deliberately indifferent to Wilson's serious medical needs, so the undersigned recommends dismissal of this claim.

### **Wilson's hospital visit**

Wilson also sues Officer Ramirez and two other unidentified officers who took Wilson to the hospital. He alleges that during the hospital visit, the officers interfered with his care when they ordered him to be quiet. Dkt. No. 1 at 7, 10–11. Wilson also sues these officers for "refus[ing] to call [their] supervisor to obtain permission to remove the restraints to get a full evaluation." *Id.* at 7; Dkt. No. 11 at 9–10. Liberally construing his pleadings, Wilson asserts that the officers delayed and denied him care. Because Wilson fails to show that the officers delayed any care, and he provides no facts supporting his assertion that he was unable to receive a full evaluation due to the officers' conduct, these claims should be dismissed.

Wilson states the hospital nurse told the officers that Wilson needed to advise of his injuries so that she could treat his wounds. Dkt. No. 1 at 12. Wilson then admits that

27

he told her about his injuries, which she immediately triaged. *Id.* Wilson's medical records from the hospital reflect this. Thus, Wilson's pleadings demonstrate that the officers did not cause any delay in care when they initially spoke for Wilson.

Wilson also alleges that the officers refused to remove Wilson's hand restraints, which prevented him from "get[ting] a full evaluation." Dkt. No. 11 at 9–10. But Wilson admits, and his medical records corroborate, that he received X-rays, an MRI scan, and a CT scan. Dkt. Nos. 1 at 12; 11 at 5. Wilson's medical records reflect that he had testing done, and the hospital medical personnel determined no additional procedures were needed based on the results of that testing. *See* Dkt. No. 1 at 12 (noting that he received pain medication and was referred for a follow-up in the Smith Unit Medical Department). Wilson offers no factual support or explanation for why the tests were unreliable. *See* Dkt. No. 11 at 5 (alleging that hospital staff could not perform the X-rays correctly and had difficulty getting the MRI but providing no detail for why the tests were deficient).

Because Wilson admits that he received care addressing his injuries and fails to provide any facts demonstrating why that care was insufficient, he has not stated a claim for delay or denial of care based on the officers' conduct at the hospital.

**Delay in obtaining pain medication, inhaler, and follow-up appointment**

Wilson alleges that after he returned to the Smith Unit from the hospital, two unidentified female medical staff members denied Wilson's requests for pain medication and his inhaler. Dkt. No. 1 at 13–14. Wilson also alleges that Miller is responsible for failing to respond to these requests. Dkt. No. 11 at 7–8. Based on the facts alleged, these

28

claims should be dismissed because Wilson has not shown that these Defendants were deliberately indifferent.

First, Wilson fails to allege any facts demonstrating that Miller was personally involved in prescribing or administering medications or approving medical visits. In fact, Wilson's pleadings do not indicate that he interacted with Miller at all after Wilson returned from the hospital. *See* Dkt. Nos. 1 at 12–13; 11 at 7–8. Rather, Wilson implies that Miller is responsible based on his supervisory role. *See* Dkt. No. 11 at 7–8. Because Wilson does not allege that Miller was personally involved or implemented an unconstitutional policy, Wilson's claim against Miller for a delay in receiving his pain medication, his inhaler, and a medical appointment should be dismissed. *Mouille*, 977 F.2d at 929; *see, e.g., Evans v. Santos*, No. 4:15-CV-72-DMB-JMV, 2017 WL 590301, at *10 (N.D. Miss. Feb. 14, 2017) ("[Plaintiff] cannot otherwise demonstrate supervisory liability against . . . [d]efendants because he has not identified an unconstitutional policy or practice implemented by a supervisory official.").

Wilson alleges that "[t]he Smith Unit Medical Department refused [him his] pain medication [and his] inhaler." Dkt. No. 1 at 12. He states that he requested a specific pain medication—acetaminophen—from a female medical staff member while he was in administrative segregation on July 15, 2024, and again sometime in August, but he did not receive it. *Id.* at 13. But Wilson also implies in his complaint that he received aspirin, though he would have preferred acetaminophen. *See id.* (stating that he asked "for some acetaminophen (non-aspirin)" and "was told no."); Dkt. No. 11 at 6 (indicating that, depending on who did the pill call, "the only thing they gave [him] was non

29

aspirin"). While Wilson's complaint and questionnaire responses are contradictory as to whether he received aspirin or acetaminophen, it's clear that he received some medication. His medical records also reflect this. To the extent that Wilson disagrees with the type of pain medication he received, he has failed to state a claim. *Domino*, 239 F.3d at 756.

Wilson has also failed to allege substantial harm. That is, he has not shown or explained how his condition worsened due to receiving a different pain medication or a delay in his preferred medication. *See Haddix v. Kerss*, 203 F. App'x 551, 553 (5th Cir. 2006) (per curiam) ("[Prisoner] has not shown that he faced a 'substantial risk of serious harm' from the occasional denial of pain medication . . . . The result of the defendants' actions was unrelieved, pre-existing, back and shoulder pain, not a worsening of his condition or other serious harm."); *Williams v. Browning*, No. 03-157, 2006 WL 83433, at *1, *3 (S.D. Tex. Jan. 11, 2006) (concluding inmate with diabetes, hypertension, anxiety, and chronic knee ailment who alleged that he was unable to timely obtain his medications did not establish any substantial harm from the delay and failed to state a claim for deliberate indifference). Wilson has thus not stated a claim based on any alleged delay of pain medication.

Wilson also alleges that the two female medical staff members delayed in providing Wilson's inhaler for his asthma and that he has a "hard time sleeping at night with breathing problems" as a result. Dkt. No. 11 at 8. Wilson admits that he eventually received his inhaler but does not know when. *Id.* Besides his own complaints, Wilson has not pleaded any facts suggesting that the medical staff members were subjectively

30

aware of a substantial risk of harm to Wilson. For example, he does not allege that he was visibly experiencing any symptoms related to his asthma. *See Rogers v. Jarrett,* 63 F.4th 971, 976–77 (5th Cir. 2023) (affirming the grant of summary judgment on prisoner's deliberate-indifference claim, where despite the defendants' awareness that the prisoner had been hit in the head, he did not have a visible injury and was acting normally such that defendants did not have subjective knowledge of the severity of the prisoner's condition).

Because Wilson has provided no facts suggesting that the medical staff members "appreciated that [Wilson] was suffering from an emergent medical issue that [they] then ignored," his claim for deliberate indifference based on the delay in providing his inhaler fails. *Murray,* 2024 WL 6901585, at *11.

Finally, Wilson indicates that one of the female staff members refused to see him when he submitted a request. Dkt. No. 11 at 10. However, he provides no context for the request, nor does he specify what harm resulted from not receiving an appointment at that time. Because Wilson has failed to factually develop this claim, it should be dismissed.

**4.     The undersigned recommends dismissal.**

The undersigned recommends that the United States District Judge dismiss without prejudice Wilson's claims against the Smith Unit Medical Department and for injunctive relief as moot and dismiss with prejudice all other claims.

**5.     Wilson has the right to object.**

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these

31

findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: March 23, 2026.

_____
AMANDA 'AMY' R. BURCH
**UNITED STATES MAGISTRATE JUDGE**

32